**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| BEAU RUEHL, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. |
| | ) | |
| v. | ) | Judge |
| | ) | |
| MIDWEST EQUITY MORTGAGE, LLC, | ) | Magistrate Judge |
| | ) | |
| | ) | |
| Defendant. | ) | |

## COMPLAINT

Plaintiff, Beau Ruehl (RUEHL), by his attorneys Gaffney & Gaffney P.C., for his

Complaint against Midwest Equity Mortgage, LLC, (MIDWEST), states:

### Jurisdiction and Venue

1.     This action is brought pursuant to the Fair Labor Standards Act, 29 U.S.C. § 201,

*et. seq.*, ("FLSA"), Family Medical Leave Act, 29 U.S.C. § 2601, *et. seq.*, ("FMLA"), Illinois

Minimum Wage Law, 820 ILCS 105/1, *et. seq.*, ("IMWL"), Illinois Wage Payment and Collection

Act, 820 ILCS § 115/14(c), Americans with Disabilities Act of 1990, As Amended, 42 U.S.C. §

12101 *et. seq.*, ("ADA") and the Employee Retirement Income Security Act, 29 U.S.C. § 1140

("ERISA").

2.     This Court has arising under jurisdiction pursuant to 28 U.S.C. § 1331 over

RUEHL' federal law claims and supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over

RUEHL's state law IMWL claim which is so related to his federal claims as to part of the same

case or controversy.

3.     Venue for this action properly lies in the Northern District of Illinois, Eastern

Division, pursuant to 28 USCS § 1391 as the unlawful employment practices were committed

within the Northern District of Illinois.

**Parties**

4.      RUEHL is a citizen of Illinois and resident of Elgin, Kane County, Illinois. At all times relevant, RUEHL was employed by MIDWEST in Oakbrook, Illinois and from his home office in Elgin, Illinois.

5.      RUEHL is a military veteran having served in the Navy from the years 1997 to 2000. During his term of service, he sustained military service injuries resulting in his honorable discharge in the year 2000.

6.      MIDWEST is an Illinois Limited Liability Company principally located in Oakbrook, DuPage County, Illinois.

7.      MIDWEST is an Illinois Manager-Managed LLC. David Hansen and Peter Gambrione were at all times relevant the LLC Managers.

8.      At all times relevant, Edwin C. Ernst IV was an attorney hired by MIDWEST to act as its outside counsel working at the law firm of Carmody MacDonald, P.C. of St. Louis, Missouri.

9.      At all times relevant, Glenn Tortorice was the Director of Employee Development at MIDWEST. He also performed Human Resource responsibilities for MIDWEST.

10.      At all times relevant, Eric Meadow was an attorney with his principal office in Meadow Vista, California and licensed to practice law in the state of California. Meadow acted in part as General Counsel and in part as Operations Manager for MIDWEST.  Meadow is not licensed to practice law in the state of Illinois. Meadow had not complied with Illinois Supreme Court Rule 706 when acting as an attorney for MIDWEST with RUEHL or  as MIDWEST's General Counsel admitting the same to the Illinois Supreme Court's ARDC, vowing to then remove his title as General Counsel.

**Common Allegations**

2

11.     RUEHL was first employed by MIDWEST on or about March 7, 2016 as a "Marketing Analyst". He was subsequently given the title of "Marketing Manager" on or about July 22, 2016 although his duties and responsibilities largely remained the same. At that time, RUEHL was appraised that he would be managing two (2) employees, but RUEHL never managed two (2) employees on a regular basis.

12.     At or near the time RUEHL was given the title of "Marketing Manager", David Hansen promised him that if the individuals reporting to him continuously met expectations that he would be entitled to a "management based opportunity" which could reach up to one-third of his salary. David Hansen also represented  that RUEHL would receive a bonus if he was the "lead source" of any revenue generating business based upon a percent of the revenue generated. At that time, RUEHL's manner of pay was then changed from an hourly rate employee to a salaried employee effective July 17, 2016.

13.     From July 17, 2016 to the end of his employment in December 2017, RUEHL was always compensated on a salary basis. Previously, RUEHL had received some but not all overtime pay for hours worked more than forty (40) hours per week. However, beginning July 17, 2016 and continuing through the end of his employment, RUEHL no longer received any additional compensation for overtime hours worked.

14.     Notwithstanding the promises and representations made by David Hansen to RUEHL, RUEHL never received any compensation bonus for his "management-based opportunity". Additionally, MIDWEST never provided RUEHL with any percent of revenues generated by new  business that he was the "lead source" for and which created extensive revenue for MIDWEST. Although RUEHL worked tirelessly,  MIDWEST only paid RUEHL his salary from July 17, 2016 to the end of his employment. MIDWEST failed to follow through on any

additional promised compensation  even though RUEHL met or exceeded performance
expectations and received no performance based discipline.

15.     RUEHL worked himself to the bone until on September 30, 2017, RUEHL notified
MIDWEST that he needed to take FMLA leave because of his own serious health conditions.
RUEHL's request was approved effective October 2, 2017. Despite seeking return from qualified
leave effective January 2, 2018, RUEHL never returned to active duty.

16.     On or about October 2, 2017, RUEHL submitted a group short-term disability
claim with Guardian Life Insurance company of America (Guardian)  along with Medical
certification from RUEHL's physician providing that RUEHL was totally disabled from work
beginning October 2, 2017 with an expectation of a return to work date of January 22, 2018.  The
MIDWEST LTD benefit was self-insured and Guardian was the mere agent and third party
administrator acting with MIDWEST to process RUEHL's claim. RUEHL's  claim was not
effectively processed and delayed by MIDWEST causing RUEHL and his family to live on the
financial edge.

17.     Beginning on or about October 23, 2017, RUEHL began making claims that since
MIDWEST never provided exempt work and ignored Hansen's promise of additional
compensation, that he was entitled to be paid overtime wages for his massive number of overtime
hours slugged into his work.

18.     Effective on or about November 1, 2017, the health insurance coverage RUEHL
had through MIDWEST with Blue Cross Blue Shield (BCBS) was either terminated or suspended.
For periods of time while out on approved FMLA leave, RUEHL and his family had no insurance
coverage to provide their health care providers resulting in unpaid medical bills and then denials
of needed medical service.

19.     On November 6, 2017, RUEHL desperately communicated to David Hansen that he was entitled to be paid something for the additional compensation promised him in July 2016.

20.     RUEHL further communicated with Glenn Tortorice, Dave Hansen and Eric Meadow stating "Good Morning. I'm at the end of my patience. I've received no disability pay to date, I received another bill for $35,598.86 from my hospitalization while covered under company insurance (attached) and I am unable to schedule specialist visits because I have no insurance policy or group members for the medical providers to confirm I have insurance."

21.     Also, on November 6, 2017, RUEHL emailed Eric Meadow which provided, in part, that expectations made, and commitments conveyed have not been followed through on. He then stated "the Department of Labor defines exempt versus non-exempt.  Dave made a commitment to compensate me for leadership duties however never followed through. That would relegate the position to non-exempt and overtime would be owed". Adding "as I'm sure you know, the Department of Labor takes very seriously the classification of exempt versus non-exempt so companies don't make unfulfilled promises to get more hours of work out of employees." ...... "please advise as to whether Dave acknowledges the commitment or not. That may impact my filing time with the proper entities". RUEHL further communicated with Eric Meadow stating, in part, "I hope you also know that my intent has been and is to resolve this internally. However, I will not be taken advantage of, lied to or discriminated against and I feel as that is happening based on the experiences and lack of expectations being fulfilled on such things as disability insurance payments, medical insurance policy coverage (none found at this time and I have pending specialists to see that I have to wait on)." In the email, RUEHL stated that one of the outstanding items that needed to be resolved was "active insurance coverage with account and policy numbers for medical, dental and vision". He states "I received a bill for $35,598.86 that Len assured me was covered and it was an ER admittance however the insurance provider continues to

decline the claim". He concludes "If we cannot resolve number 3 (medical insurance) and number 7 (unpaid medical bill) by the end of day Friday I will be forced to file grievances with the proper state and federal entities. I have been out for over a month on approved short-term disability with FMLA yet I have received less than $150 from my company shorting me the $1000 per week disability payment to put food on my family of sixes table. I cannot get the medical treatment my doctor prescribed because coverage is lacking." RUEHL added on that "Unfortunately a specialist will not schedule without confirming insurance or paying cash. I am forced to wait according to providers. I even had to pay cash for prescriptions last week. These items are all related to health and family. Insurance coverage, performance bonus, management bonus and job appraisal impact family and health greatly. I have been trying to resolve internally since February."

22.     On November 18, 2017, RUEHL communicated with Eric Meadow stating, in part "On Monday I plan to file the remaining claims I have against the business with entities including but not limited to the CFPV, IDFPR and EEOC."

23.     On November 21, 2017, RUEHL provided Meadows with a lengthy email communication, in part, stating "the Department of Labor will provide oversight to ensure we are following the legislation to the letter and spirit intended". He also said, "as my request for fair compensation has not been resolved in an acceptable manner I will be filing an inquiry with the EEOC ".

24.     On November 21, 2017, RUEHL communicated with Eric Meadows stating, "My intent is to return to work when able however I have the concerns we discussed yesterday. Here is the breakdown from yesterday's conversation:

1.      MBO&OT

a.      MBO floor was discussed at 30,000

b.      OT calculated to just under 70,000"

6

25.     RUEHL further stated that MIDWEST misclassified him as a salaried exempt employee, adding "Department of Labor will provide oversight to ensure we are following legislation to the letter and spirit intended". RUEHL concluded, "At this point I would rather file my claims and have them be processed by the governing agencies. If I am wrong, then I am wrong and hopefully won't have to deal with any retaliation however 25,000 is not worth giving up on".

26.     On or about December 4, 2017, RUEHL provided MIDWEST with a Certification of Health Care Provider for Employee Serious Health Condition under the FMLA from his physician. The certification provided, in part, that the condition commenced October 2, 2017 and that the patient needed to have ongoing treatment visits. The period of incapacity was stated as October 2, 2017 through December 31, 2017.

27.     On December 1, 2017, RUEHL's physician submitted another short-term disability claim form to Guardian Insurance Company certifying ongoing disability.

28.     On or about December 4, 2017, RUEHL requested to return to active service from approved FMLA leave on January 2, 2018.

29.     On December 8, 2017, Eric Meadow provided RUEHL with a proposed Separation and Release Agreement. From then on, MIDWEST was interested in RUEHL leaving the company pursuant to a Severance and Release Agreement and not in RUEHL's return to employment at MIDWEST. RUEHL, on the other hand, was not interested in the Severance and Release Agreement. RUEHL wanted to preserve his employment at MIDWEST while MIDWEST embarked on a course of conduct to starve RUEHL into submission and capitulation.

30.     On December 15, 2017, RUEHL communicated with Edwin Ernst confirming that he intended to return to work after January 1, 2018. He appraised Ernst that he wanted to work toward an "amicable resolution" stating that he did not want to "return to a hostile environment".

He did notify Ernst that he would be "retaining an attorney on Monday to negotiate these matters". Further adding that depending on how the discussions go, he may be filing civil actions, but did not wish these assertions "to be perceived as malicious threats but more of an expectation I can be held to".

31.     On December 15, 2017, Glenn Tortorice, Director of Employee Development confirmed receipt of  RUEHL's notice of intent to return to work January 2, 2018.

32.     As of December 2017, the RUEHL family had mounting unpaid medical bills, were receiving collection notices from medical providers and they were even financially starved out of the ability to pay cash for co-pays.  In mid-December 2017, RUEHL's wife communicated to Edwin Ernst expressing  her anger and grievous frustration over her family's inability to obtain medical care for their children.

33.     In an email dated December 26, 2017, RUEHL communicated with MIDWEST's outside counsel, Edwin C. Ernst at Carmody MacDonald stating "the next time you minimize my family's well-being, delay their needed medical treatment in a disguise of ignorance or snide my family's medical need I assure you we will continue this discussion face to face". That was in direct response to Mr. Ernst's direction to RUEHL after RUEHL attempted to contact him by telephone stating "as I've said before, please communicate with me by e-mail only".

34.     As of December 27, 2017, RUEHL had unambiguously confirmed to MIDWEST that he was not interested in a proposed Severance Agreement and that he intended to report to work on January 2, 2018.

35.     On December 27, 2017, RUEHL communicated with Edwin Ernst stating, in part "in regards to insurance and my wife, your ignorance shows through again. MEM does not have a "system" as they have not taken part in the technology from BCBS. I explained this to your receptionist as did the BCBS rep I had call her to attempt to get the same information. You, your

office and MEM are making it take longer and require more effort to obtain the same medical services other employees receive. Why?".

36.     Prior to FMLA leave, RUEHL had previously worked many hours from home and adequately performed work there. As of October 2, 2017, RUEHL was told that instead of going on FMLA he could work from home.  However, on December 27, 2017, Edwin Ernst notified RUEHL that despite request, RUEHL would not be entitled to "work remotely" for MIDWEST and that RUEHL would be required to undergo a mental health evaluation prior to returning to work.

37.     During the afternoon of December 27, 2017, RUEHL was so frustrated with MIDWEST that he communicated to Edwin Ernst that "he had the day to resolve my wife's medication issues with her birthday or I will report you to the ARDC, DA, U.S. Attorney's office and State Attorney's office".

38.     On December 27, 2017, Edwin Ernst notified RUEHL that his employment was terminated effective December 27, 2017.  As of the date and time RUEHL was terminated on December 27, 2017, RUEHL was on approved FMLA leave of absence.

39.     On February 8, 2018, MIDWEST General Counsel Eric Meadow stated in a letter to the Illinois Department of Employment Security that RUEHL's employment was terminated because he purportedly "acted with the intent to undermine the company" claiming that after RUEHL obtained approved FMLA leave on September 1, 2017 that he communicated with management purporting to have an agenda to leverage the company for a severance payment but then submitted a demand and later refused to negotiate in good faith. Meadow asserted that RUEHL threatened to make unfounded allegations to multiple state and federal agencies in an attempt to extract money from the company claiming that his communications with MIDWEST were "hostile and threatening, resulting in his termination on December 27, 2017".

40.     On or about February 14, 2018, the Illinois Department of Employment Security held an evidentiary hearing regarding RUEHL's claim for unemployment compensation. The administrative law judge hearing the evidence concluded that "The Claimant's remarks failed to constitute a threat. He merely asked to meet, with the employer's attorney, since he was not willing to talk to him, on the telephone. The employer was looking for any way, to discharge the Claimant, while he was on FMLA. They had manufactured a reason for the Claimant's discharge. The Claimant did not seek to harm his employer. The Claimant did not deliberately violate his employer's reasonable rules or policies. He was working to the best of his ability. The Claimant was discharged but not for misconduct as defined by Section 602a of the Act".

## Count I – FLSA Wage Action

1-40.    RUEHL incorporates herein paragraphs 1 through 40 of the preliminary and common  allegations as paragraphs 1 through 40 of this Count I as if fully set forth herein, verbatim.

41.      RUEHL's primary roles included administration of electronically maintained data, vendor relationships, account reporting and website management. He worked primarily with real estate agents and loan officers. RUEHL regularly prepared advertising flyers and other print material and delivered them to real estate agents and loan officers.  RUEHL was constantly on the phone with vendors or emailing them in a non-managerial capacity.

42.      As of July 17, 2016, MIDWEST misclassified RUEHL as a salaried employee and paid him on a salary basis.

43.      Throughout the tenure of his employment, RUEHL regularly worked substantially more than forty (40) hours per week.

44.      RUEHL often worked in the Oakbrook office from about 7:00am to 3:00pm each work day and would only take a short meal break during that time frame. He then would drive

home and continued to work from home typically until after 9:00 pm on most evenings. He also worked most Saturdays for approximately another seven (7) hours.

45.     Between RUEHL's first date of employment on or about March 7, 2016 and the date MIDWEST misclassified RUEHL as an exempt salaried employee, MIDWEST occasionally paid RUEHL for his overtime hours worked. However, RUEHL was entitled to receive an overtime rate of pay at $69.44 during that interval and MIDWEST failed to properly pay RUEHL for all of his overtime hours worked. MIDWEST knowingly permitted RUEHL to work many additional hours without compensation.

46.     At all times relevant, MIDWEST had over fifty (50) employees, and its annual volume of sales or business exceeded $500,000.

47.     RUEHL and other MIDWEST employees worked in interstate commerce and they regularly communicated with persons in multiple states.

48.     MIDWEST is engaged in interstate commerce. MIDWEST is licensed as a mortgage lender in Illinois, California, Florida, Indiana, Kansas, Missouri, Washington and Wisconsin, but also does business in other states that do not require a mortgage license disclosure. MIDWEST also has offices in San Diego, California; Schaumburg, Illinois; Chesterfield, Missouri; Creve Coeur, Missouri; and Brookfield, Wisconsin.

49.     At all times relevant, RUEHL was an "employee" of MIDWEST as defined by the FLSA. 29 U.S.C. § 203(e).

50.     At all times relevant, MIDWEST was an "employer" as that term is defined by the FLSA. 29 U.S.C. § 203(d).

51.     MIDWEST directed or knowingly permitted RUEHL to work regularly in excess of forty (40) hours per week. In July 2016, MIDWEST knowingly and purposefully made RUEHL a salaried employee and gave him a work load of over 75 hours per week with vague promises of a

11

"management based bonus opportunity" and bonus for new business opportunities to squeeze the most productivity it could out of his salary and avoid its obligation to pay over-time wages.

52.     RUEHL was entitled to be paid overtime wages at the rate of one and one-half times his regular rate of pay for all his hours worked more than forty (40) hours per week.

53.     MIDWEST violated the FLSA by failing to pay RUEHL an overtime rate of not less than one and one-half times his regular rate for all hours worked.

54.     Defendant's failure to pay overtime wages was a willful violation of the FLSA.

55.     In addition to wages due and owing, RUEHL is also entitled to an award of liquidated damages in an amount equal to the amount of unpaid wages due.

56.     RUEHL demands Trial by Jury on Count I.

WHEREFORE, RUEHL respectfully requests that this Honorable Court declare Defendant to be in violation of the FLSA and to:

     a.  Enter a judgement in the amount of unpaid wages and overtime wages for all time worked by RUEHL more than forty (40) hours in individual work weeks;

     b.  Award liquidated damages to RUEHL in an amount equal to the amount of unpaid wages;

     c.  Award reasonable attorneys' fees and costs; and

     d.  Grant such additional or alternative relief as this Honorable Court deems just and proper under the instant circumstances.

**Count II – Illinois Minimum Wage Law, ("IMWL"), Overtime Wage Claim**

1-55.    RUEHL incorporates herein paragraphs 1 through 55 of the prior allegations as paragraphs 1 through 55 of this Count II as if fully set forth herein, verbatim.

57.      At all times relevant, RUEHL was an "employee" of MIDWEST as defined by the IMWL. 820 ILCS 105/3(d).

58.     At all times relevant, MIDWEST was an "employer" as that term is defined by the IMWL. 820 ILCS 105/3(c).

59.     This Count arises from Defendant's failure to pay RUEHL overtime wages for all time worked more than forty (40) hours in individual work weeks in violation of the IMWL.

60.     Defendant violated the IMWL by failing to pay RUEHL an overtime rate at one and one-half times his regular rate of pay for hours worked more than 40 hours per week.

61.     Pursuant to 820 ILCS 105/12(a) RUEHL is entitled to recover from Defendant unpaid wages for three years prior to the filing of this suit plus penalties.

WHEREFORE, RUEHL respectfully requests that this Honorable Court declare that Defendant to have violated the IMWL and responsible for the following:

      a.  A judgement in the amount of all wages due to RUEHL as provided by the IMWL;

      b.  Award statutory damages for RUEHL pursuant to the formula set forth in 820 ILCS 105/12(a);

      c.  Award reasonable attorneys' fees and costs of this action as provided by the IMWL; and

      d.  Grant such other and further relief as this Honorable Court deems just and proper under the instant circumstances

### Count III – FLSA Retaliation Claim

1-55.   RUEHL incorporates herein paragraphs 1 through 55 of the prior allegations as paragraphs 1 through 55 of this Count III as if fully set forth herein, verbatim.

62.      The FLSA forbids employers from discharging or otherwise discriminating against an employee who files a complaint, institutes a proceeding, or testifies in a proceeding regarding a complaint made under the Act. 29 U.S.C. § 215(a)(3). Oral and written complaints to company

13

officials regarding FLSA violations are protected under the Act's anti-retaliation provision. *Kasten v. Saint-Gobain Performance Plastics Corp.*, 563 U.S. 1, 14 (2011).

63.     As described above, RUEHL engaged in protective conduct under the FLSA by repeatedly making demands that MIDWEST pay him overtime wages and threatening to file an overtime wage claim with the Illinois and U.S. Departments of Labor.

64.     RUEHL suffered the following discrimination and adverse employment actions after RUEHL engaged in protected FLSA conduct:

    a.  MIDWEST made an internal determination that it no longer wanted RUEHL to work for MIDWEST and thereafter engaged in a course of conduct designed to squeeze RUEHL out of his job and accept a Severance Package. This included, but was not limited to, failing and refusing to properly administer RUEHL's claim for short-term disability benefits and health insurance benefits.

    b.  After RUEHL declined the severance proposal of MIDWEST and notified MIDWEST of his intent to return to work on or about January 2, 2018, MIDWEST then discharged RUEHL on December 27, 2017.

65.     There is a causal link between RUEHL's FLSA protected activity and the aforesaid adverse employment action as set is forth more fully above in the Common Allegations.

66.     Employers who violate the anti-retaliation provision of § 15(a)(3) "shall be liable for such legal and equitable relief as may be appropriate to effectuate the purposes of § 215(a)(3) of this title, including without limitation employment, reinstatement, promotion and the payment of wages lost and an additional sum as liquidated damages". 29 U.S.C. § 216(b).

67.     RUEHL has suffered damages and harm as a result of MIDWEST's violation of § 16(b) of the FLSA and therefore RUEHL seeks all remedies available pursuant to the FLSA which includes reinstatement, lost wages, liquidated damages equal to the lost wages, front pay,

compensatory damages, prejudgment interest, punitive damages, reasonable attorney's fees, costs and litigation expenses.

68.     RUEHL demands trial by jury on Count III.

WHEREFORE, RUEHL seeks judgment against MIDWEST for all legal and equitable relief available pursuant to the FLSA including reinstatement, lost wages, liquidated damages equal to the lost wages, front pay, compensatory damages, prejudgment interest, punitive damages, reasonable attorney's fees, costs and litigation expenses along with such other equitable relief this court deems just.

## **Count IV – IWPCA Retaliation**

1-61.    RUEHL incorporates herein paragraphs 1 through 61 of the prior allegations as paragraphs 1 through 61 of this Count IV as if fully set forth herein, verbatim.

69.     This Claim is brought pursuant to the anti-retaliation provisions of the Illinois Wage Payment and Collection Act which mandates that: "any employer or any agent of an employer, who discharges or in any other manner discriminates against any employee because that employee has made a complaint to his employer... that he or she has not been paid in accordance with this Act ... is guilty, upon conviction, of a Class C Misdemeanor. An employee who has been unlawfully retaliated against shall be entitled to recover through a claim with the Department of Labor or in a Civil Action, but not both, all legal and equitable relief as may be appropriate. In a Civil Action, such employee shall also recover cost and all reasonable attorney's fees". 820 ILCS § 115/14(c).

70.     MIDWEST is an "employer" as that term is defined by the IWPCA (cite statute).

71.     RUEHL was an "employee" as that term is defined by the IWPCA (cite statute).

72.     RUEHL engaged in protected conduct under the IWPCA as set forth more fully above in the Common Allegations.

73.     MIDWEST discriminated against RUEHL in violation of the IWPCA in the following regards:

  a.  After RUEHL made demands for compensation due, MIDWEST made an internal determination that it no longer wanted RUEHL to work for MIDWEST and thereafter engaged in a course of conduct designed to squeeze RUEHL out of his job and accept a Severance Package. This included, but was not limited to, failing and refusing to properly administer RUEHL's claim for short-term disability benefits and health insurance benefits. The attorneys and agents of MIDWEST repeatedly frustrated RUEHL and desired to force his hand into accepting a severance package as they had previously accomplished with on or more other employees in similar circumstances.

  b.  After RUEHL declined the severance proposal of MIDWEST and notified MIDWEST of his intent to return to work on or about January 2, 2018, MIDWEST then discharged RUEHL on December 27, 2017.

74.     There is a causal link between RUEHL's IWPCA protected activity and the aforesaid adverse employment action as set forth above in the Common Allegations.

75.     As a direct and proximate result thereof, RUEHL has sustained damages and pursuant to the IWPCA RUEHL seeks all legal and equitable relief as may be appropriate.

76.     RUEHL does not have an IWPCA Claim filed or pending with the Illinois Department of Labor.

WHEREFORE, RUEHL seeks all legal and equitable relief available pursuant to the IWPCA which includes liquidated damages, back pay, front pay, value of lost benefits, make whole equitable relief, attorney's fees and cost of suit.

## Count V – FMLA Interference

1-40.   RUEHL incorporates herein paragraphs 1 through 40 of the preliminary and common allegations as paragraphs 1 through 40 of this Count V as if fully set forth herein, verbatim.

77.   During the years 2016, 2017 and 2018, MIDWEST employed fifty (50) or more employees in twenty (20) or more work weeks within a seventy-five (75) mile radius of RUEHL's work location in Oakbrook, Illinois, and thus, MIDWEST was, at all times relevant, a "covered employee" pursuant to the FMLA.

78.   At all relevant times, MIDWEST is an "employer" within the meaning of the FMLA. 29 U.S.C. § 2611(4)(a)(i).

79.   At all relevant times, RUEHL was an eligible employee of MIDWEST under the FMLA. 29 U.S.C. § 2611(2)(A).

80.   RUEHL was eligible for FMLA leave as he had worked on a full-time basis for a period in excess of twelve (12) months without a break in employment and well in excess of 1,250 hours of service within the preceding twelve (12) months for MIDWEST as a FMLA covered employer.

81.   MIDWEST approved RUEHL's request for FMLA leave effective on or about October 2, 2017 to January 2, 2018.

82.   As set forth more fully above in the Common Allegations, MIDWEST interfered with RUEHL's FMLA rights in the following regards:

a.   MIDWEST failed to maintain the RUEHL family's  health insurance benefits during his FMLA leave of absence.

b.   MIDWEST terminated RUEHL's employment on December 27, 2017.

83.     MIDWEST knew its failure to maintain RUEHL's health insurance benefits and employment termination violated the FMLA. MIDWEST acted with malice or reckless indifference to the federally protected rights of RUEHL.

84.     Such actions and/or inactions deliberately and willfully interfered with the FMLA rights of RUEHL.

85.     As a proximate result of MIDWEST's actions, RUEHL has suffered and will continue to suffer substantial and irreparable injury, loss of income and other monetary benefits, and other compensatory damages.

86.     RUEHL demand trial by jury on Count V.

WHEREFORE, RUEHL respectfully requests that this Honorable Court, as to Defendant:

    a.  Reinstate Plaintiff to the same or equivalent position as he had before he was terminated and grant Plaintiff a judgment in such sum as this Court may deem equitable and just for back-pay, back benefits, front pay and benefits, compensatory damages, and interest;

    b.  Grant Plaintiff a judgment in such sum as this Court may deem equitable and just for liquidated damages;

    c.  Award Plaintiff reasonable attorneys' fees and costs; and

    d.  For such other and further relief as this Honorable Court deems equitable and just.

### Count VI – ADA Retaliation

1-40.   RUEHL incorporates herein paragraphs 1 through 40 of the prior allegations as paragraphs 1 through 40 of this Count VI as if fully set forth herein, verbatim.

87.     The ADA prohibits employers from retaliating against employees who assert their rights under the Act. 42 U.S.C. §12203(a).

88. RUEHL is disabled within the meaning and purview of the Americans with Disabilities Act. In the alternative, RUEHL was regarded as disabled by Defendant.

89. RUEHL was well-qualified to perform the job of "Marketing Manager". RUEHL had duly and adequately performed his duties and responsibilities as a "Marketing Manager" preceding his employment termination on December 27, 2017.

90. RUEHL requested that because of his medical disability that he be provided a temporary reasonable accommodation that he be able to work from home. In December 2017, MIDWEST failed to accommodate RUEHL's disability or even engage in an appropriate interactive process so as to determine the reasonableness of the accommodation.

91. RUEHL engaged in ADA statutorily protected activity as set forth more fully above in the Common Allegations, including but not limited to, requesting a medical leave of absence because of his serious medical conditions, requested a reasonable accommodation that he temporarily be allowed to work from home and threatening to file charges with state and federal agencies, including the EEOC.

92. RUEHL suffered adverse action after he engaged in ADA statutorily protected activity in that on December 27, 2017, MIDWEST terminated the employment of RUEHL.

93. Prior to his termination, RUEHL was performing his job satisfactorily. MIDWEST had not warned or disciplined RUEHL for performance issues and never claimed or asserted that RUEHL's performance was the basis for his discharge.

94. RUEHL was terminated for pretextual reasons. While RUEHL was on a medical leave of absence as a result of his disability, various communications occurred between RUEHL and management of MIDWEST including MIDWEST's General Counsel, Eric Meadow. MIDWEST claimed that as a result of those communications RUEHL "acted with intent to undermine the company". MIDWEST terminated RUEHL after RUEHL advised Eric Meadow

and MIDWEST that he could file charges with state and federal agencies, including the Equal

Employment Opportunity Commission (EEOC). MIDWEST and its' General Counsel, Eric

Meadow claimed that "RUEHL threated to make unfounded allegations to multiple state and

federal agencies in an attempt to extract money from company". MIDWEST claimed that

RUEHL's protected conduct was "hostile and threatening, resulting in his termination on

December 27, 2017."  RUEHL had the legal right to make the claims that he did and his

termination as a response thereto violates the ADA.

94. RUEHL was singled out by MIDWEST for termination.  Other similarly situated

employees who did not engage in protected activity were not terminated. MIDWEST has an open

door policy and its' stated company policy is to allow employees to raise employment related

claims, including but not limited to, claims of discrimination, without being under the threat of

termination, yet with RUEHL, MIDWEST terminated his employment. MIDWEST viewed

RUEHL's assertion that he could file charges with the EEOC as a hostile threat and acted upon it.

96. There is a causal connection between RUEHL'S ADA protected activity and the

decision of MIDWEST to terminate RUEHL's employment.

97. As a proximate result of these practices, RUEHL has suffered and will continue to

suffer substantial and irreparable injury, loss of income and other monetary benefits, and

compensatory damages.

98. Defendant's actions were intentional, willful and malicious, or were committed

with reckless indifference to RUEHL's federally protected rights.


99. On April 25, 2018,  RUEHL filed a Charge of Discrimination against MIDWEST

with the EEOC, Chicago District Office, Charge Number 440-2018-1260 on the basis of ADA

retaliation. A copy of that charge is attached as Exhibit A.

100.     On May 1, 2018, the EEOC issued a Notice of Right to Sue pertaining to RUEHL's Charge Number 440-2018-1260 against MIDWEST on the basis of ADA retaliation. A copy of that Notice of Right to Sue is attached as Exhibit B.

101.     RUEHL demand trial by Jury on Count VI.

WHEREFORE, RUEHL respectfully requests that this Honorable Court, as to Defendant:

    a.   Reinstate Plaintiff to the same or equivalent position as he had before he was terminated and grant Plaintiff a judgment in such sum as this Court may deem equitable and just for back-pay, back benefits, front pay and benefits, compensatory damages, and interest;

    b.   Grant Plaintiff a judgment in such sum as this Court may deem equitable and just for punitive damages;

    c.   Award Plaintiff reasonable attorneys' fees and costs; and

    d.   For such other and further relief as this Honorable Court deems equitable and just.

Respectfully submitted,

*/s/ Glenn R. Gaffney*
Glenn R. Gaffney,
Attorney for Beau Ruehl

JURY DEMAND

RUEHL demands trial by Jury on Counts I, III, V and VI.

*/s/ Glenn R. Gaffney*
Attorney for Plaintiff

Glenn R. Gaffney
Gaffney & Gaffney PC
1771 Bloomingdale Road
Glendale Heights, IL 60139
(630) 462-1200
Fax (630) 462-7698
glenn@gaffneylawpc.com
Attorney No. 28191